USCA1 Opinion

 

 March 23, 1994 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1700 SONIA M. MORET RIVERA, Plaintiff, Appellant, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Carmen Consuelo Cerezo, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Torruella and Selya, Circuit Judges. ______________ ____________________ Juan A. Hernandez Rivera and Raymond Rivera Esteves on brief for ________________________ _______________________ appellant. Cuillermo Gil, United States Attorney, Maria Hortensia Rios, ______________ ______________________ Assistant United States Attorney, and Robert M. Peckrill, Assistant ___________________ Regional Counsel, Department of Health and Human Services, on brief for appellee. ____________________ ____________________ Per Curiam. Claimant Sonia Moret Rivera appeals a  __________ district court judgment that affirmed the decision of the Secretary of Health and Human Services denying claimant's application for Social Security disability benefits. The discrete question before us is whether substantial evidence supports the Secretary's conclusion that claimant retained the residual functional capacity (RFC) to perform her past work as a secretary before her insured status expired. Finding substantial evidence to support this conclusion, we affirm. I. On October 18, 1990, at age 49, claimant filed an initial application for disability benefits with a Florida district office of the Social Security Administration (SSA). Claimant alleged that she had been disabled from work since December 15, 1985 due to the surgical removal of two left ribs, left arm numbness and pain and back pains. (Tr. 61). Claimant's insured status expired on December 31, 1989. Claimant graduated from high school and received additional training as a secretary around 1961. (Tr.65) Between 1963 and 1985, she worked as a secretary, receptionist, and office clerk at various companies in her native Puerto Rico. (Tr. 66). Her responsibilities included typing letters, filing, answering the telephone, using calculators, taking orders from customers, and other office procedures. (Tr. 33, 66).1 The medical evidence discloses that claimant began experiencing left wrist pain with paresthesias of the left upper extremity in December, 1983. (Tr. 86). In early 1984, claimant was evaluated by Dr. Jose Lozada-Roman for recurrent anterior chest pain and numbness of the left arm. (Tr. 136). X-rays of claimant's cervical spine taken on February 6, 1984 disclosed the presence of a left cervical rib and osteophytosis (bony growths) of the mid-dorsal vertebrae. (Tr. 85). Vascular studies from that period further revealed that claimant experienced severe compression of the sub- clavian artery with her arms overhead and mild vasospastic flow with the arms at rest. (Tr. 83-84). Dr. Lozada-Roman opined that claimant's evaluation, which included a positive Adson's test, "was strongly suggestive of thoracic outlet  ____________________ 1. Claimant's disability report indicated that her past work required her to perform the light exertional tasks of lifting weights of up to 10 pounds frequently and 20 pounds occasionally, sitting for four hours and walking and standing, respectively, for two hours each. (Tr. 66). See ___ 20 C.F.R. 404.1567(b). -3- syndrome." (Tr. 136).2 He referred claimant to a vascular surgeon, Dr. Raul Garcia-Rinaldi. On March 25, 1984, claimant was admitted to the Houston, Texas Memorial Hospital under the care of Dr. Garcia-Rinaldi. She again reported that in December 1983 she experienced the onset of left wrist pain that radiated to her elbow and associated numbness of the left hand. Her condition was aggravated by physical activity. (Tr. 106). She also complained of left-sided neck and shoulder pain with paresthesias of the left upper extremity, tachycardia, light headedness, palpitations, diaphoresis, neck, facial, and anterior chest flushing, diarrhea, a sensation that there was a lump in her throat, and generalized anxiety. Dr. Garcia- Rinaldi found no increase of left wrist pain upon sustained hyperextension of the wrist and that the distal pulses were symmetrical at rest. (Tr. 107). His initial impression was that claimant suffered from a left cervical rib, rule out  ____________________ 2. Thoracic outlet syndrome is "compression of the brachial plexus nerve trunks, characterized by pain in arms, paresthesia of fingers, vasomotor symptoms ... and weakness and wasting of small muscles of the hand; it may be caused by drooping shoulder girdle, a cervical rib or fibrous band, an abnormal first rib, continual hyperabduction of the arm, or (rarely) compression of the edge of the scalenus anterior muscle." R. Sloane, The Sloane-Dorland Annotated Medical- ______________________________________ Legal Dictionary (1987), p. 697. Adson's test is one method _________________ of diagnosing thoracic outlet syndrome. Dorland's _________ Illustrated Medical Dictionary, (27th ed. 1988), p. 1674. ______________________________ -4- thoracic outlet syndrome, and generalized anxiety with a history of acute anxiety attacks. (Tr. 107.)3 On March 26, 1984, Dr. William Fleming evaluated claimant as a consultant to Dr. Garcia-Rinaldi. Dr. Fleming found that claimant exhibited a full range of motion of the cervical spine, although she complained of a popping sensation when she turned her neck. Tinel's sign was positive at both wrists, the left greater than the right.4 There was moderate weakness of the left abductor pollicis brevis muscle (i.e., the muscle between the wrist and the ____ first joint of the thumb) and decreased sensation in the first three fingers of the left arm. Dr. Fleming's impression was that claimant had left median neuropathy of the wrist (carpal tunnel syndrome).5 Other possible  ____________________ 3. Claimant does not argue that she is disabled as a result of anxiety or any other mental impairment. 4. Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." Dorland's Illustrated Medical ______________________________ Dictionary, at 1526. "The sign is often present in the __________ abnormal tingling sensation in the fingers and the hand (carpal tunnel syndrome)." The Mosby Medical Encyclopedia, _______________________________ (1985), p. 730. 5. Carpal tunnel syndrome is "a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow." Dorland's Illustrated Medical Dictionary, at 1632. "This __________________________________________ compression produces paresthesias in the radial-palmar aspect of the hand plus pain in the wrist, in the palm, or sometimes proximal to the compression site in the forearm and shoulder. Sensory deficit in the first 3 digits and/or weakness and -5- conditions to be ruled out were thoracic outlet syndrome, left brachial plexopathy, and cervical radiculopathy. (Tr. 103). Dr. Fleming recommended an electromyogram, nerve conduction studies, and x-rays of both wrists and the cervical spine. A March 27, 1984 electromyogram was normal. (Tr. 86). In addition, cervical spine films and x-rays of both wrists were within normal limits except for the presence of the left cervical rib that had been previously found. (Tr. 86). The record suggests that no nerve conduction studies were done in 1984. On March 29, 1984, Dr. Garcia-Rinaldi diagnosed claimant to be suffering from thoracic outlet syndrome due to compression of the subclavian arteries caused by the left cervical and first ribs. (Tr. 93). He performed a transaxillary resection of these ribs. His operative report indicates that when the rib sections were removed, "the subclavian artery and its veins were released" and "[e]xcellent distal pulsations were obtained in all positions." (Tr. 93).6  ____________________ atrophy in the muscles controlling thumb abduction and apposition may follow." The Merck Manual, (Robert Berkow, ________________ M.D., et al., eds., 16th ed. 1992), p. 1519. 6. Dr. Garcia-Rinaldi later submitted a letter to the Florida disability evaluation service in connection with claimant's initial application. There he stated that the diagnosis of thoracic outlet syndrome resulting from a left cervical rib "was quite clear" and that, to the best of his knowledge, claimant had satisfactory results following the March 1984 surgery. (Tr. 132). During the course of -6- Claimant was discharged from the hospital on April 3, 1984. She returned to work after the surgery and continued to work until December 1985. Claimant alleges that while she experienced some improvement following the surgery, she continued to experience arm pain and numbness that eventually adversely affected her work performance and caused her to be fired.7 Claimant has not worked since the alleged onset of her disability on December 15, 1985. There are no medical records from 1985, 1986, or 1987. Between August 12, 1988 and April 1991, Dr. Tomas Jordan saw claimant five times per year for various conditions. While Dr. Jordan's office records are largely illegible, they indicate that claimant had a history of thoracic outlet syndrome that was treated with the surgical removal of a cervical rib. (Tr. 108). Dr. Jordan treated claimant for numbness of the left arm, cervical spasm and hematuria during August and September 1988. He prescribed Decadron, an anti- inflammatory drug, and other medications. (Tr. 124-27). X- rays from that time disclosed mild straightening of the  ____________________ claimant's 1984 hospitalization claimant also underwent testing for chest pain and other problems. She was found to have chronic esophagitis and bladder polyps, which were removed. (Tr. 86, 89). 7. Claimant's disability report states that the operation, which was performed under her left arm, caused "slow movement" of her arm. Claimant reported that as a result, she kept getting slower at work and that she did not perform her work with accuracy. (Tr. 61). -7- cervical spine and mild osteophytes of the thoracic spine. (Tr. 131). Dr. Jordan indicated that claimant's impairments included carpal tunnel syndrome, cervical myositis, hiatal hernia, microhematuria, gastritis, and irritable colon syndrome. (Tr. 112). However, he did not specify when she suffered from symptoms associated with these conditions, nor did he state that any of these conditions were disabling either during or after the insured period. Dr. Jordan referred claimant to a physiatrist for her thoracic outlet syndrome and prescribed medications, physical therapy, and diet for her other symptoms. (Tr. 108, 112). On December 17, 1990, claimant was examined by Dr. Percival Tamayo, a Florida internist and SSA consultant. At that time claimant reported that she could still do some housework and lift weights less than ten pounds. Physical examination disclosed that claimant's neck was supple and that claimant exhibited no pain on hyperextension or rotation. The back showed no significant paravertebral muscle spasm and no spine deformity. Her lower extremities were normal. There was no significant reduction in the range of motion in claimant's cervical or lumbar spine, and no pain was produced during the range of motion testing. Neurological examination was grossly unremarkable. Palpation of the chest wall elicited tenderness over the costochondral junction at the second and third rib levels, especially on -8- the left side. Dr. Tamayo concluded that claimant suffered from non-cardiac chest pain consistent with costochondritis (an inflammation of the cartilage connecting the ribs to the sternum) and that her residual left arm discomfort may be secondary to her previous thoracic outlet syndrome. No other significant abnormalities were noted. (Tr. 133-34). Dr. Lozada-Roman also submitted a report dated 12/20/90. In addition to the aforementioned history, he stated that claimant was then experiencing "some discomfort" in the left arm and difficulty writing and lifting objects. He recommended that she again see a vascular surgeon and have a neurological evaluation. (Tr. 136). On January 2, 1991, claimant's initial application was denied. She immediately filed a request for reconsideration which was also denied. Claimant filed a request for a hearing before an administrative law judge (ALJ) and submitted additional medical evidence. On April 9, 1991, claimant saw Dr. Victor Gonzalez, a specialist in physical medicine and rehabilitation. (Tr. 137-38). His records are also largely illegible. Nevertheless, Dr. Gonzalez reported that claimant was experiencing pain in her chest and elbows in 1991, as well as numbness of both arms, more so on the left. Claimant also alleged that she had pain in her left hip. Physical examination disclosed tenderness on palpation of the cervical resection area. A 4/10/91 note suggests that -9- claimant's symptoms were consistent with carpal tunnel syndrome and thoracic outlet syndrome. (Tr. 138). An April 17, 1991 electromyogram of claimant's upper limbs was normal. (Tr. 113). However, nerve conduction studies from that date showed early signs of carpal tunnel syndrome and entrapment neuropathy of the ulnar nerve at Guyon's canal. April 1991 x-rays of claimant's lumbar spine were normal. (Tr. 151-53). On May 24, 1991, claimant had another vascular study. This disclosed mild compression of the right subclavian artery with the arm to side and arm to back maneuvers and severe compression with the arms overhead. The left subclavian artery also exhibited mild compression with the arms overhead. Claimant's circulation was normal with her arms at rest, although she experienced mild vasospastic flow in both hands. Dr. Ivette Matos Serrano, a neurologist, began treating claimant around 1991. (Tr. 28). On June 20, 1991, one and one-half years after claimant's insured status expired, Dr. Matos reported that claimant was experiencing numbness in the posterior part of the head, frequent headaches, paresthesias, cramps of both upper extremities, and "an electric-like sensation along the posterior aspect of the left upper extremity down to the fingers[.]" The remainder of her report suggests that claimant's condition was considerably more dire than that described by Dr. Tamayo, the SSA's consultant. For example, -10- Dr. Matos indicated that claimant had muscle spasms in her cervical, paravertebral, and trapezius muscles, that her range of motion testing revealed significant limitations and pain, and that claimant exhibited diminished sensation in her left arm and leg and "slight weakness" of both handgrips. Based on her examination and the 1991 vascular and nerve conduction studies, Dr. Matos diagnosed claimant to be suffering from severe bilateral thoracic outlet syndrome, chronic cervical syndrome, bilateral carpal tunnel syndrome, bilateral entrapment neuropathy of the ulnar nerves, and chronic lumbar syndrome with clinical signs and symptoms suggesting radicular involvement. She concluded that claimant had suffered from bilateral thoracic outlet syndrome since 1983, and that while she experienced some improvement on her left side following surgery in 1984, her condition became progressively aggravated. Dr. Matos opined that it was understandable for claimant's symptoms to remain following surgery as in many patients symptoms do recur. She advised that claimant would continue to need treatment for an indefinite time and that her labor prognosis was extremely poor. However, Dr. Matos did not express an opinion on whether claimant was disabled during the insured period. (Tr. 142-47). Claimant and her attorney appeared for a hearing before an ALJ on August 1, 1991. Claimant testified that she could -11- no longer work as a result of her 1984 operation and continuing pain and numbness. She explained that after her operation, her "ability to work decreased" and she was fired as a result. (Tr. 25).8 Claimant asserted that she did not go back to work because she felt "ill" and "demoralized", noting that she experienced "lots of pains in the neck, muscular spasms which continued after the operation[, and her] arms got numb." (Tr. 26). While claimant acknowledged that she experienced some improvement after the operation, pains and numbness of both arms continued. Claimant testified that she is incapacitated because of the pain she constantly feels. (Tr. 26, 32.)9 On August 27, 1991, the ALJ issued a decision denying claimant's application for benefits. The ALJ specifically found that during the relevant insured period, claimant suffered from severe cervical myositis and status post trans- axillary resection of her left cervical and first ribs. Although these conditions did not meet or equal the SSA's  ____________________ 8. We note that claimant indicated that her employer did not admit that her health problems cause her to be fired. (Tr. 61). Moreover, Dr. Matos reported that claimant was dismissed from her job because of a nervous condition, not because of her physical complaints. (Tr. 143). 9. Claimant also stated that she had problems swallowing related to her esophagus and hiatal hernia, and cramps in her arms and legs. (Tr. 26). She testified that she experienced strong neck and back pain which is only temporarily relieved with medication and that she can only sit and stand for 10 minutes at a time. (Tr. 34-37). -12- listings of impairments, the ALJ found that they imposed significant limitations on claimant's ability to lift and carry. With respect to claimant's complaints of pain and numbness, the ALJ found: ... the claimant's neck pain is sustained as being secondary to her cervical myositis evidenced by mild straightening of the cervical spine. However, subsequent to the claimant's surgery on March 29, 1984, she did not present objective clinical findings in which to sustain her allegations of chest pain or left arm numbness until subsequent to the critical period in issue. Through December 31, 1989, the claimant was not prescribed strong analgesics and there is no evidence of significant restrictions in her daily activities and social functioning suggestive of her inability to perform within all exertional levels. Based on these findings, the ALJ concluded that claimant retained the residual functional capacity to perform sedentary work through December 31, 1989. (Tr. 15, 16). He then went on to conclude that claimant's impairments did not disable her from performing her past light work as a _____ secretary. (Tr. 15, 16).10 Consequently, the ALJ denied  ____________________ 10. The ALJ specifically found that claimant's past work "involved sitting four hours, standing and walking two hours, respectively, frequent bending and reaching and lifting and carrying 10 pounds frequently and 20 pounds occasionally. (Tr. 14). As noted above at n. 1, these exertional requirements are consistent with light work. Moreover, the ALJ also found that claimant has the RFC "to perform work related activities except for work involving lifting and carrying over 10 pounds frequently and 20 pounds ____ occasionally." (Tr. 16). Implicit in this statement is the assertion that claimant can lift up to 10 pounds frequently and 20 pounds occasionally. -13- benefits at step four of the sequential evaluation process. See Goodermote v. Secretary of Health and Human Services, 690 ___ __________ ______________________________________ F. 2d 5, 6-7 (1st Cir. 1982). The Appeals Council denied review, thus rendering the ALJ's decision final. Claimant sought judicial review pursuant to 42 U.S.C. 405(g). The district court summarily affirmed the Secretary. This appeal followed. II. On appeal, claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ ignored the uncontroverted evidence of disability provided by Drs. Jordan, Tamayo, and Matos and substituted his own, unqualified medical opinion in place of the evidence provided by these physicians. Claimant says that the medical evidence provided by these physicians established that she is at least disabled from performing her past secretarial work due to thoracic outlet syndrome, carpal tunnel syndrome, left arm numbness, and pain. Claimant further argues that the ALJ erred in concluding that she has the residual functional capacity (RFC) to perform her past relevant work absent an RFC assessment by a physician. Finally, claimant contends that the ALJ failed to give appropriate consideration to her complaints of disabling pain. -14- We must affirm the Secretary's decision if it is supported by substantial evidence on the record as a whole. Rodriguez v. Secretary of Health and Human Services, 647 F.2d _________ ______________________________________ 218, 222 (1st Cir. 1981). "Claimant is not entitled to disability benefits unless [s]he can demonstrate that h[er] disability existed prior to the expiration of h[er] insured status." Cruz Rivera v. Secretary of Health and Human ____________ _________________________________ Services, 818 F.2d 96, 97 (1st Cir.), cert. denied, 497 U.S. ________ _____ ______ 1042 (1987). It is not sufficient for a claimant to establish that her impairment had its roots before the date that her insured status expired. Rather, the claimant must show that her impairment(s) reached a disabling level of severity by that date. See, e.g., Deblois v. Secretary of ___ ____ _______ ____________ Health and Human Services, 686 F.2d 76, 79 (1st Cir. 1982); _________________________ Tremblay v. Secretary of Health and Human Services, 676 F.2d ________ ______________________________________ 11, 13 (1st Cir. 1982). This does not mean, however, that medical evidence from the post-insured period is always wholly irrelevant. Medical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question whether claimant's impairment(s) reached disabling severity before claimant's ______ insured status expired. See, e.g., Smith v. Bowen, 849 F.2d ___ ____ _____ _____ 1222, 1225 (9th Cir. 1988); Basinger v. Heckler, 725 F.2d ________ _______ 1166, 1169 (8th Cir. 1984)(collecting cases); Gonzalez v. ________ Secretary of Health and Human Services, 757 F. Supp. 130, 134 ______________________________________ -15- (D.P.R. 1991); Alcaide v. Secretary of Health and Human _______ ________________________________ Services, 601 F. Supp. 669, 672-73 (D.P.R. 1985).  ________ While we think claimant overstates the strength of the evidence from Drs. Jordan, Tamayo, and Matos, we are troubled by the ALJ's finding that claimant did not present objective clinical findings to sustain her allegations of left arm numbness until after her insured status expired in 1989. Dr. Jordan recorded that claimant was experiencing left arm numbness in connection with cervical spasm in August 1988. (Tr. 127). And while claimant was not prescribed strong analgesics through December 31 1989, Dr. Jordan did prescribe Decadron, an anti-inflammatory medication, in August 1988. (Tr. 126). The record as a whole suggests that claimant suffered from symptoms associated with thoracic outlet syndrome both before and after her insured status expired. Arguably, the ALJ should have considered this condition in evaluating claimant's RFC. Nevertheless, we cannot say that the ALJ erred in discounting the evidence from the post-insured period. The record discloses that for at least three of the five years after the alleged date of onset (i.e., 1985, 1986, and 1987), claimant sought no medical treatment. A gap in the medical evidence may itself be evidence that claimant's condition was not as dire as alleged. See Irlanda Ortiz v. Secretary of ___ _____________ ____________ Health and Human Services, 955 F.2d 765, 769 (1st Cir. ___________________________ -16- 1991)(gaps in record supported conclusion that claimant's pain was not as intense as alleged). Apart from one 1988 complaint of numbness and cervical spasm, which was treated with Decadron, there is no evidence that claimant's condition was particularly troubling during the insured period that remained after her surgery, much less disabling. We think that a single complaint of numbness and spasm does not undermine the ALJ's conclusion that claimant retained the RFC to perform sedentary work during the insured period. See ___ Gordils v. Secretary of Health and Human Services, 921 F.2d _______ _______________________________________ 327, 329 (1st Cir. 1990)("if the only medical findings in the record suggest that a claimant exhibited little in the way of physical impairments, but nowhere in the record did any physician state in functional terms that the claimant had the exertional capacity to meet the requirements of sedentary work, the ALJ would be permitted to reach that functional conclusion himself"). This conclusion is further supported by the ALJ's finding that there is no evidence of significant restrictions in claimant's daily activities and social functioning during the insured period.11 We recognize that  ____________________ 11. To be sure, claimant testified that she had not driven in 3 or 4 years, that her daughter did most of the housework, and that while she goes to church, she spends most of her time lying down due to her various ailments. (Tr. 24, 33, 39). But it is clear that claimant was speaking of her condition at the present, and did not focus on her condition between 1985 and 1989. As it was claimant's burden to prove that she was disabled before her insured status expired, claimant was required to adduce evidence on her condition -17- the ALJ did not stop there, however, and went on to conclude that claimant retained the RFC to perform her past light work _____ as a secretary. We expressly limited our holding in Gordils _______ to sedentary work, noting that the evidence that the claimant had a "weaker back" was not sufficient to support the conclusion that the claimant could do the more physically demanding light work. See 921 F.2d at 329.12 Claimant ___ argues that the ALJ erred by concluding that claimant could perform light work without an RFC from a physician. We have repeatedly admonished that ALJs generally are not qualified to assess RFC based on a bare medical record. See, e.g., ___ ____ Gordils, 921 F.2d at 329; Rivera-Torres v. Secretary of _______ _____________ _____________ Health and Human Services, 837 F.2d 4, 6-7 (1st Cir. 1988). _________________________ And while this principle does not preclude ALJs from rendering "common sense judgments about functional capacity" that do not overstep the bounds of a lay person's competence, Gordils, 921 F.2d at 329, where significant exertional _______  ____________________ during that period. And, in contrast to claimant's testimony, the evidence in her 1990 disability report, which was prepared only ten months after claimant's insured status expired, indicated that claimant could drive, cook, do "some" cleaning and shopping, and take care of flowers. (Tr. 64). Given the gap in the medical evidence from the insured period, this supports the ALJ's conclusion that the sedentary base was intact during that time. 12. We note that in Gordils, a nonexamining physician had _______ indicated that claimant could do light work. We affirmed the denial of benefits only on the ground that the record supported the implicit conclusion that claimant also could perform sedentary work. See 921 F.2d at 329. ___ -18- limitations are present, an exertional RFC is required. See ___ Perez v. Secretary of Health and Human Services, 958 F.2d _____ ________________________________________ 445, 446-47 (1st Cir. 1991). However, in order to trigger this requirement, the claimant must first put her RFC in issue. Thus, in Santiago v. Secretary of Health and Human ________ ______________________________ Services, 944 F.2d 1, 4 (1st Cir. 1992), we upheld an ALJ's ________ determination that a claimant retained the RFC to perform her past, light work as a sewing machine operator absent an expert's RFC because the record demonstrated that claimant had "only relatively mild mental and physical impairments" and claimant never clarified the particular respects in which her impairments prevented her from performing her past work. We emphasized that to meet the burden of proof at step 4, a claimant must produce evidence of the physical and mental demands of her prior work and describe how her impairment(s) precluded the performance of that work "in the relevant ________________ period." Id. at 5.  ______ ___ Here, while the claimant described both her duties and her present impairments, neither her testimony nor the _______ medical evidence explained how her impairments precluded the performance of work-related tasks during the insured period. Rather, the record as a whole suggests that claimant recovered from her surgery and did not seek treatment for the three years that ensued (1985, 1986, and 1987). And while claimant sought treatment again in 1988, there was no -19- evidence as to the frequency or duration of her symptoms during the relevant period, nor did claimant explain how her symptoms precluded the performance of the various tasks associated with her past work during that time. Thus, where claimant failed to focus her proof on the relevant insured period, and the medical evidence from that time does not suggest that claimant continuously suffered from disabling symptoms, we think the ALJ supportably concluded that claimant retained the RFC to perform her past work as a secretary notwithstanding the absence of a physician's RFC. Finally, claimant argues that the ALJ did not give sufficient weight to her complaints of disabling pain. Once again, this argument fails because the claimant did not specify how her pain limited her functions during the insured period. The ALJ supportably found that claimant was not prescribed strong analgesics during the insured period (indeed, we cannot discern that claimant was prescribed any ___ analgesics during this time). Claimant initially reported that she could drive, shop, cook, tend flowers, and maintain social contacts. Thus, the record does not suggest that claimant's pain was disabling during the relevant period. Judgment affirmed.  _________________ -20- -21-